UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

VAUGHAN H. STEVENS, III,

     Plaintiff,

       v.

CPM CONSTRUCTORS,

     Defendant.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

Plaintiff, Vaughan H. Stevens, III ("Plaintiff" or "Stevens"), by and through undersigned

counsel, complains against the Defendant, CPM Constructors ("Defendant" or "CPM"), as follows:

INTRODUCTION

1.     This action arises under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h).

PARTIES

2.     Stevens is a United States citizen residing in Augusta, Maine.

3.     CPM is a for-profit Maine corporation headquartered in Freeport, Maine.

JURISDICTION

4.     CPM is a person subject to the FCA.

5.     This Court has subject matter jurisdiction over Plaintiff's claim pursuant to 28

U.S.C. § 1331.

FACTUAL ALLEGATIONS

6.     Stevens was employed for over three years as the Quality Assurance ("QA")

Manager for CPM before he was terminated on November 14, 2014.

7.      From August 2011 until October 2012, Stevens was employed part time and compensated at $22.50 per hour plus expenses.

8.      From October 2012 until November 2014, Stevens was full time and compensated at $1000 per week salary plus $500 per week expenses.

9.      Stevens was performing his job duties satisfactorily.

10.     Stevens received no oral or written warnings about anything prior to his termination.

11.     Defendant responded "not applicable" to the Maine Human Rights Commission's request for a copy or account of all verbal or written reprimands, warnings, or disciplinary actions issued to Stevens in the two years prior to March 24, 2015.

12.     CPM is a general contractor that builds bridges, roads, and other heavy civil construction projects.

13.     The Maine Department of Transportation ("MaineDOT") hired CPM to construct the replacement for the Martin's Point Bridge. This was a MaineDOT Design/Build construction project. A substantial amount of funding for the bridge came from the federal government. CPM was obligated to satisfy all contractual and MaineDOT requirements as a condition of payment of the federal funds.

14.     Stevens was assigned to work as the QA Manager on the Martin's Point Bridge Replacement Project.

15.     Stevens expected to work for CPM until the Martin's Point project was completed in about January 2015 and then to continue working for CPM until all of the paperwork associated with the project was completed in the months following the finish of the construction.

16.     Eldon L. Morrison ("Morrison") is the founder of CPM.

17.     The current owners of CPM are Morrison, Ms. Stacey L. Morrison, Timothy A. Ouellette and Paul M. Koziell.

18.     Morrison is the Chairman of the Board and Chief Executive Officer, Ouellette is the Chief Financial Officer, Koziell is the Chief Operating Officer, and Ms. Morrison is a Vice President.

19.     Peter Krakoff is a Vice President and Chief Engineer for CPM. He served as the Project Manager for the MaineDOT Martin's Point Bridge project.

20.     Jacob Hall worked for CPM as the Project Document Coordinator, Quality Control Technician, Layout, Estimator, and Site Engineer.

21.     Dan Veno worked for CPM as the Project Superintendent.

22.     Craig Hurd worked for the MaineDOT as the MaineDOT Resident Engineer for the Martin's Point Bridge project.

23.     MaineDOT Design/Build construction projects are performed in accordance with a Construction Quality Management Plan ("CQMP") which is submitted by the contractor and approved by the MaineDOT.

24.     In the CQMP for the Martin's Point Bridge project, Morrison was designated as Stevens's direct supervisor.

25.     In reality, and as directed by the project documents, Stevens worked independently and did not report his day-to-day activities to Morrison.

26.     Morrison did not request reports from Stevens about his work.

27.     According to the CQMP project documents, Morrison was to remain independent from the project and only become involved at Stevens's request if there was an issue Stevens could not resolve on his own.

28.     Morrison was involved with management of the project from a financial standpoint.

29.     MaineDOT construction projects are governed by State and federal laws and regulations including but not limited to 23 M.R.S. §4243 which authorizes the MaineDOT to adopt contract specifications. The MaineDOT Standard Specifications can be viewed at http://maine.gov/mdot/contractors/publications/standardspec/.

30.     Mitchell Bois was a CPM employee who was designated as Stevens's Assistant QA Manager for the Martin's Point Bridge project.

31.     Over Stevens's objections, Bois was quickly reassigned to other management duties within the company not specific to the Martin's Point Bridge project.

32.     MaineDOT Resident Engineer Hurd was aware of and accepted the reassignment of Bois provided that Stevens covered everything that needed to be done and Bois was available to fill in during Stevens's time off.

33.     Stevens's primary job duty on the Martin's Point Bridge project was to make sure that the bridge was built in accordance with the CQMP and MaineDOT specifications.

34.     Stevens had full authority and responsibility for assuring effective implementation and maintenance of a quality system and for instituting any and all actions necessary for the successful implementation of the CQMP.

35.     When an item was not built as was proposed, it was Stevens's job to point it out and to approve a proposed resolution of the problem and ensure that the same mistake was not made again.

36.     As the MaineDOT Resident Engineer for the Martin's Point project, Hurd was responsible for contract compliance and approval of payments to the contractor. If Hurd was not

happy with the quality of materials or work, he had the authority to withhold payment until the item was acceptable.

37.     Construction of the new Martin's Point Bridge began in the fall of 2012.

38.     In about September 2013, inspectors from the Federal Highway Administration ("FHWA") came to Maine and interviewed the team working on the Martin's Point Bridge project.

39.     The FHWA people questioned how Stevens could be a direct employee of CPM and still perform the duties of Quality Acceptance ("QA").

40.     It was not an accepted practice of the FHWA to allow a direct employee of the Design/Builder to serve as a CQMP Manager/QA Manager but MDOT had accepted the proposed manner and the FHWA agreed to continue to allow it for this project.

41.     Most Design/Build projects require that the QA manager be completely independent to avoid an actual or apparent conflict of interest.

42.     The FHWA people were not satisfied with the level of testing and self-inspection that CPM had in place and mandated that CPM hire an independent inspection firm to perform QA inspections.

43.     S.W. Cole Engineering, Inc. ("SWC") was already performing this function on a limited basis when Stevens needed assistance. Due to the directive from FHWA, SWC's role was expanded to perform more of the QA and inspections on the project going forward.

44.     Early on in his employment, Stevens drafted a letter to Veno, Hall and Krakoff listing concerns about the quality of several items.

45.     Stevens handed the letter to Hall as a draft and cautioned him that the items needed to be addressed or the letter would become an official project document. Stevens had not

had much luck with verbal communication and felt a letter might spur some action.

46.     Krakoff called Stevens an hour or so later completely upset about the fact that a letter might be written and reflect poorly on CPM. Krakoff reminded Stevens that he (Stevens) was on CPM's payroll.

47.     Krakoff's only concern was that a letter had been written. He expressed no concerns and offered no remedies for the problems identified in the letter.

48.     About an hour later, Krakoff arrived at the work site and apologized to Stevens for the threat. Krakoff specifically asked that Stevens contact him and give him a chance to remedy the situation any time he (Stevens) felt that he needed to write a letter.

49.     Stevens accepted Krakoff's apology.

50.     From that point on, Stevens was very careful to avoid putting his issues and concerns about non-compliance in writing.

51.     Stevens repeatedly raised concerns with Hall and Veno about the need for CPM to bring the finish on structures under the bridge including the abutments, wingwalls, and piers into compliance with MaineDOT specification 502.10 (Forms and Falsework).

52.     MaineDOT Resident Engineer Hurd was also concerned and expressed dissatisfaction with CPM's work in this regard.

53.     In spite of Stevens's expressed concerns, CPM did not correct the surface defects and did not propose a plan for compliance.

54.     On November 13, 2014, at 9:58 AM, Stevens finally wrote an email to Hall, Veno and Krakoff about CPM's failure to bring the finish on several structures of the bridge into compliance with MaineDOT specifications. Stevens was concerned that with cold weather approaching it would soon be too late to fix the problems. Stevens asked Hall to let him know

what CPM planned to do to bring the surface finish on the bridge into compliance.

55.     At 1:17 PM the same day, Hall wrote back. Hall sent a copy of Stevens's original email as well as his reply to the MaineDOT Resident Engineer and to Morrison.

56.     Hall's irritation with Stevens was apparent by the fact that he addressed Stevens as "Mr. Stevens" instead of "Vaughan."

57.     Hall indicated that the project team was aware of the surface defects and that they would be repaired prior to the completion of the project although he did not say when. Hall also stated that he did not agree that the surfaces required a rubbed finish.

58.     At 2:38 PM the same day, Stevens responded to Hall with a copy to Veno, Krakoff, Hurd, and Morrison. Stevens indicated that most of the work that needed to be done would be grinding, but that some of the areas needed to be parged and possibly rubbed. Stevens pointed out that two piers were already sealed which is not done when surface defects remain. A structure should not be sealed until it is complete.  Stevens recounted prior conversations he had had with Hall and Veno about this issue.

59.     Hall suggested that a meeting with the owner was in order.

60.     Stevens agreed and proposed that a walk of the abutments was needed as well as a boat ride of the piers and that Hurd should be included in the inspection and meeting.

61.     The following day, November 14, 2014, Stevens was terminated.

62.     On November 14, 2014 at 12:00 PM, Morrison called and asked Stevens to meet with him in Morrison's office.

63.     Stevens met with Mr. Morrison at 12:30 PM.

64.     Stevens's attitude and behavior was polite and professional. He had never been introduced to Morrison prior to this meeting so Stevens introduced himself and asked Morrison

how he was. Morrison said that he was not well. Stevens asked if it was okay for him to take a seat and how he could help.

65.     Morrison's response was belligerent and laced with profanity.

66.     Morrison asked Stevens who his direct supervisor was even though both men knew that Morrison was Stevens's supervisor.

67.     Morrison asked why it was that he was just now hearing about eight different problems on the Martin's Point bridge project. Stevens asked how he came up with eight problems; there was only one problem that Stevens knew of, the one involving surface finishes. Morrison listed off eight items which included cracks in MUP, pavement issues, concrete finishes, and rip rap. Stevens explained each issue and how they were being managed.

68.     Morrison asked why he wasn't informed about the issues directly by Stevens. Stevens explained what Morrison already knew, that Stevens worked independently and did not report to Morrison about his day to day activities. Stevens told Morrison that he assumed that Morrison was kept informed about progress on the bridge during his daily conversations with Krakoff. Stevens also told Morrison that if there was anything he was interested in, he could certainly get involved.

69.     Morrison moved on to accuse Stevens of costing the company too much money by "over testing" on the project. Stevens told Morrison that he was keeping testing to a minimum as required. Morrison resorted to profanity and told Stevens that the budget was "blown way out" for testing and it was Stevens's fault.

70.     Stevens kept testing to a minimum and did not over test. Stevens self-performed some of the testing until the FHWA told him to stop and informed the MaineDOT that an independent testing firm was required to do testing. Hurd, Hall, Veno and Krakoff were all

present at the progress meeting when this occurred. After that, SWC was hired to perform the testing. The testing was not costly by any objective measure. Stevens believes that the testing and inspections performed by SWC cost about 170 thousand dollars, less than one percent of the 24.5 million dollar project.

71.     Morrison asked why SWC was on site every time the sub-contractor, Shaw Brothers, was on site. Although Stevens was sure that Krakoff already explained this to Morrison, Stevens informed Morrison that Shaw Brothers was not self-performing QC as required and that almost from the beginning the MaineDOT required that QA have an independent inspector watch over all of their work. Stevens expressed that Morrison should be taking up his concerns with the subcontractor and that the cost of the extra QA inspection was caused by Shaw Brothers, not Stevens. Stevens also informed Morrison that everyone on the project team was well informed of this. The subject had been discussed and the requirement put in place during a progress meeting early on in the project.

72.     Morrison then criticized Stevens for allowing the extensive finish work that was done on the "Kansas rail," the concrete barrier that was constructed along the top of the Martin's Point Bridge. The Kansas rail has a lot of surface area due to the windows and gaps in the barrier. CPM put a lot of effort into the finish on the rail to make it weather resistant as well as aesthetically correct. Morrison said that Stevens should have stopped CPM from exceeding the requirements and blamed Stevens for it costing the company thousands of dollars. Stevens told Morrison that it was his duty to ensure that CPM met or exceeded the standards. It was not up to Stevens to tell the Superintendent not to exceed the requirements.  This role is clearly spelled out in the CQMP and the MDOT Request for Proposal (RFP book1 QA).

73.     Morrison asked if Stevens had any interaction with utilities. Stevens told

Morrison that some CMP poles were left in an area where they conflicted with proper landscaping. Veno refused to move them, taking the position that since MaineDOT required Central Maine Power ("CMP") to move the poles, it was MaineDOT's problem to get CMP to pick up the poles. Stevens recommended to Veno that CPM take the initiative to move the poles until CMP came by to get them. Veno still refused to move the poles so Stevens asked Hall to arrange for them to be moved and to arrange for CMP to come get them. Stevens assisted when CPM actually moved the poles. Morrison seemed to agree with how Stevens handled this issue.

74.     Morrison then asked if Stevens had any control of the traffic control plan ("TCP"). Stevens said yes, that he had oversight of TCP as part of the CQMP.

75.     Morrison then accused Stevens of disparaging the company to the MaineDOT and referenced Stevens's November 13, 2014 email. Stevens pointed out that he had sent the email to in-house people only and it was Hall who chose to include the MaineDOT when Hall replied. Stevens also tried to explain why he was concerned about the finish on the structures under the bridge but Morrison was not interested.

76.      Morrison accused Stevens of "colluding" with the MaineDOT. Stevens asked Morrison to explain. Morrison stated that Stevens should not have direct interaction with the MaineDOT and that Stevens was informing the MaineDOT of things that should have remained internal. Stevens told Morrison that his role as defined in the project documents was to work closely with the MDOT and that from the beginning of the project, he and Hurd agreed to work together to try and make the process work.

77.     Morrison asked Stevens if everything was up to date on the project. Stevens said that everything with QA was up to date except the pile driving logs which needed to be finalized and uploaded to the server. Stevens explained why the logs were not complete and informed

Morrison that everyone on site, including the client, understood and accepted this. Stevens also told Morrison that QC was three months behind on daily reports, NCRs, preplacement forms and other paperwork. Morrison stated that was unacceptable. Stevens explained that Hall was way behind because he was doing other people's work, which Morrison knew of because he assigned some of it to Hall. Hall was also studying for his upcoming Professional Engineer test. The client was aware and okay with this as long as Hall was working on catching up, which he was.

78.    Morrison stopped listening to Stevens before he finished his explanations.

79.    Morrison stated that he wanted Stevens to either resign or be terminated.

80.    Stevens told Morrison that he has never quit and had no intentions of quitting on this project. Stevens told Morrison that if he wanted Stevens gone he would need to fire Stevens.

81.    Morrison terminated Stevens.

82.    Stevens told Morrison that it was not in the project's or the company's best interest for this to happen. Morrison did not seem to care.

83.    Stevens told Morrison that he had to finish his daily reports for the week and upload them to the server. They agreed to have Bois meet Stevens at the site.

84.    Stevens met Bois at the site and gave Bois the information and files Bois would need.

85.    Bois told Stevens that Morrison and other managers had spent the morning trying to figure out how to fire Stevens.

86.    Bois told Stevens that he was asked about Stevens's November 13, 2014 email and that he (Bois) told the managers that Stevens was right and more finish work on structures under the bridge was needed before the cold weather arrived.

87.    Stevens complained about conduct by CPM that could have reasonably led to

CPM knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval of federal funds by failing to meet its preconditions for payment of the federal funds in question.

88.     Stevens complained about issues on the Martin's Point Bridge project that could reasonably lead to a Qui Tam action against CPM. Stevens's complaints constituted protected activity for purposes of the FCA.

89.     Stevens's concern about the concrete surfaces was not a cosmetic issue that posed no concerns about the safety or integrity of the bridge.

90.     Stevens's concerns were not about mere "punch list" items," minor items that can be corrected just prior to or soon after project completion.

91.     Quality standards for finish work are to ensure the long-term safety and structural integrity of the bridge not for aesthetics.

92.     As of November 13, 2014, the finish work on the Martin's Point Bridge did not comply with specifications which were required by State and federal law.

93.     If the underside of the bridge had been left in the condition it was in as of November 13, 2014, those surfaces would not be weather resistant to water and the freeze/thaw cycle, which could undermine the bridge's structural integrity.

94.     Stevens was informed by Hall that Veno was not going to perform any more finish work and considered it complete when Stevens reported his concerns to him.

95.     Stevens believed that further work was not going to be performed in part because Veno had already sealed the piers.

96.     CPM completed more surface finish work under the bridge after Stevens wrote the emails in November 2014. CPM brought back staff that had already been reassigned to other

projects. Upon information and belief, CPM also brought in more temporary labor to do this work. No plans for more surface finish work had been made before Stevens wrote the emails.

97.     Stevens had reasonable cause to believe that CPM did not intend to meet the quality standards for finish work beneath the bridge in violation of specifications that are required by State and federal law.

98.     Stevens also had reasonable cause to believe that CPM's failure to perform the finish work undermined the long-term safety and structural integrity of the bridge not just for aesthetics.

99.     Stevens was acting in good faith to stop fraud. Stevens's sole purpose in speaking up about the need for more surface finish work was to prompt CPM to meet the specifications, a precondition to receipt of federal funds.

100.    Stevens reported the fact that the surfaces on the underside of the bridge did not meet the MaineDOT/federal specification 502.10 (Forms and Falsework).

101.    CPM had received and was going to continue receiving federal funds for the bridge as if it fully complied with all required specifications in violation of the FCA.

102.    Stevens's opposition to fraud angered CPM and caused his termination.

103.    CPM's stated reasons have shifted over time, are untrue, and do not account for the timing between Stevens's protected activity and his termination.

104.    On November 14, 2014, the day he terminated Stevens, Morrison wrote an email stating the reasons for his termination:

> "Vaughan Stevens was terminated by me today for some performance issues, failure to meet responsibilities under the Quality Assurance Plan, and the failure to communicate directly to me when he should."

105.    These same three reasons were included in a Termination Report prepared by

13

CPM on November 17, 2014.  No other reasons for termination were cited in Mr. Morrison's email or the termination report.

106.   CPM's reasons for termination morphed substantially after he filed a complaint with the Maine Human Rights Commission ("MHRA"), the state agency that investigates, among other things, complaints of whistleblower retaliation.

107.   CPM told the MHRC that Stevens was terminated mainly for subjective reasons for which CPM offers no probative evidence.

108.   Where there is objective evidence (e.g., the tone of Stevens's November 13, 2014 email), the facts do not support CPM's claims.

109.   The first new reason given by CPM is the claim that Stevens was terminated because of the unprofessional manner in which Stevens communicated with his peers, impugning their pride of craftsmanship and their professionalism in a confrontational and unnecessarily inflammatory manner.

110.   The only objective evidence about Stevens's manner and professionalism is Stevens's emails to CPM personnel on November 13, 2014 which CPM characterizes as "condescending, self-righteous and inflammatory" even though Stevens wrote, in part, that the "[Kansas] rail looks awesome" and "I know the client is very pleased."

111.   The second new reason given by CPM to the MHRC is that Stevens was terminated because he (Stevens) addressed Morrison in an "impudent and dismissive fashion," brushing off his own performance failures, and "denigrat[ing] his peers."

112.   CPM's second new reason is subjective, untrue, and ironic given that it was Morrison who resorted to profanity during the November 13, 2014 meeting when Morrison terminated Stevens.

14

113.    To the extent that Stevens may have been defensive during the meeting several things are notable. Stevens had worked directly for Morrison for over three years and had never been asked to meet with Morrison to discuss anything. Morrison started the meeting by demanding to know who Stevens reported to, a question that was aggressive and purely rhetorical since Stevens had never questioned the fact that Morrison was his boss. Morrison showed no interest in hearing Stevens's answers and explanations. Based on Bois's statements to Stevens after he was terminated, the reason for Morrison's abusive behavior during the meeting is clear. Morrison intended to terminate Stevens before the meeting even began.

114.    CPM's third new reason is that Stevens was allegedly terminated because Stevens did not communicate directly with Morrison sooner about the quality control issues that Stevens was raising.

115.    This is factually true but not the real reason for Stevens's termination.

116.    The finish work on the concrete structures beneath the bridge was an ongoing issue.

117.    Hall and Veno would always tell Stevens that they would take care of it when they could get a barge as a platform to work on. They told Stevens that the work would be done towards the end of the project.

118.    Although the specification requires that repairs be made immediately after stripping forms, Stevens knew that it was common and usually acceptable to wait and do the work "later." By mid-November 2014, "later" had arrived and Stevens was concerned that cold temperatures would make it impossible for CPM to comply with the specification. The CQMP directed Stevens to inform Morrison of problems only if Stevens was unable to get them solved at the project level.

119.     Other new reasons for termination cited by CPM to the MHRC included claims that Stevens had an "exaggerated level of self-importance" and a "complete inability to understand that the company needed to be focusing its full time and attention on completion of the project" by December 31, 2014 rather than "worrying about minor punch list items."

120.     CPM's personal attacks on Stevens are puzzling and untrue. Stevens took his job as QA Manager seriously. Stevens thought that it was important that CPM properly finish bridge structures to ensure the bridge's long term safety and structural integrity and to comply with MaineDOT/federal specifications. Stevens never said that other work that needed to be done to complete the project was unimportant.

121.     If CPM asserts that Stevens was terminated because he was behind in completing paperwork, the reason is pretextual. Hall and Veno were behind on paperwork too and were not terminated. Everyone who has worked on a large project knows that paperwork lags and it takes time to catch up.

122.     During the termination meeting, Morrison accused Stevens of "colluding" with MaineDOT and disparaging CPM to the MaineDOT. While the accusation is untrue, it reflects Morrison's state of mind when he terminated Stevens. Morrison believed that Stevens was acting in opposition to CPM's interest in reporting his concerns about non-compliance and instead, working in the interest of the client, MaineDOT. Morrison's false accusation shows that the decision to terminate Stevens was retaliatory.

123.     The timing of Stevens's protected activity and the adverse employment actions against him evidence a causal connection.

124.     The discriminatory and retaliatory animus displayed towards Stevens by Defendant's managers evidences unlawful retaliation.

125.    Defendant unlawfully retaliated against Stevens with malice or with reckless indifference to his federally protected rights.

126.    Defendant's knowingly and willfully violated Stevens's rights.

127.    As a result of Defendant's unlawful retaliation, Stevens has suffered damages including but not limited to lost wages, lost benefits, loss of enjoyment of life, inconvenience, injury to reputation, injury to career, and other pecuniary and non-pecuniary losses.

128.    Stevens has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and will continue to suffer irreparable injury from Defendant's treatment unless Defendant is enjoined by this court.

129.    CPM terminated Stevens's employment because of FCA retaliation.

## COUNT I: FCA

130.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1-128 as if fully set forth herein.

131.    Defendant engaged in unlawful discrimination and retaliation within the meaning of the FCA.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court grant the following relief:

(a)    Enter Judgment in his favor;

(b)    Declare the conduct engaged in by Defendant to be in violation of Plaintiff's rights;

(c)    Enjoin Defendant, their agents, successors, employees, and those acting in concert with Defendant from continuing to violate the rights of the Plaintiff;

(d)    Order Defendant to employ Plaintiff in his former position;

(e)     Award Plaintiff equitable-relief for back pay, benefits and prejudgment interest;

(f)     Award Plaintiff liquidated damages in an amount to be determined at trial of this matter;

(g)     Award Plaintiff compensatory damages in an amount to be determined at trial of this matter;

(h)     Award Plaintiff punitive damages in an amount to be determined at trial of this matter;

(i)     Award Plaintiff nominal damages;

(j)     Award Plaintiff attorney's fees, including legal expenses, and costs;

(k)     Award Plaintiff prejudgment interest;

(l)     Permanently enjoin Defendant from engaging in any employment practice which discriminates on the basis of an employee's engagement in protected activity under the FCA;

(m)    Permanently enjoin Defendant from engaging in any retaliatory employment practices;

(n)     Require that Morrison mail a letter to all employees of Defendant notifying them of the verdict against them and stating that Defendant will not tolerate discrimination or retaliation in the future;

(o)     Require that Defendant post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

(p)     Require that Defendant train all management level employees about the illegality of discrimination and retaliation against employees in connection with engaging in activity protected by FCA;

(q)     Require that Defendant train all management level employees about the illegality

of FCA retaliation; and

      (r)      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  September 25, 2015

                        /s/ Chad T. Hansen_____
                        Chad T. Hansen, Bar No. 9489

                        /s/ Peter L. Thompson_____
                        Peter L. Thompson, Bar No. 8011

                        Attorneys for the Plaintiff

                        Maine Employee Rights Group
                        92 Exchange Street
                        Second Floor
                        Portland, Maine 04101
                        Tel   (207) 874-0905
                        Fax   (207) 874-0343
                        chansen@maineemployeerights.com
                        pthompson@maineemployeerights.com